JOHN A. COLEMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent JOHN A. AND JO ANN FULLER COLEMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent JOHN A. COLEMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coleman v. Commissioner
Docket Nos. 2925-71, 3076-71, 3077-71.
United States Tax Court
T.C. Memo 1976-148; 1976 Tax Ct. Memo LEXIS 252; 35 T.C.M. (CCH) 670; T.C.M. (RIA) 760148; May 17, 1976, Filed John A. Coleman, pro se. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief *253 Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report in Docket Nos. 2925-71 or 3077-71. Respondent filed an objection to the Special Trial Judge's report on one issue in Docket No. 3076-71. The Court, after due consideration, agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: These cases were part of a group of 37 which were consolidated for trial and briefing, although not for opinion. The present three cases, wherein the principal petitioner is John A. Coleman, are hereby consolidated for opinion. At the trial, evidence was received which bears upon all the cases in the group.Such evidence relates to certain contractual arrangements between the husband-petitioners' employers, Lockheed Aircraft Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), and the United States Air Force, as well as the employment arrangements between *254 field team members (such as the husband-petitioners) and such employers. Respondent determined deficiencies in petitioners' Federal income taxes for 1967 (Docket No. 2925-71), 1968 (Docket No. 3077-71), and 1969 (Docket No. 3076-71) in the respective amounts of $53.36, $543.18, and $887.21. The principal issue for decision, which is present for each year, is whether all or any portion of the per diem payments received by petitioner John Coleman (hereinafter, "petitioner") from his employers is includible in his gross income under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct amounts equal to all or any portion of the includible per diem payments, as away-from-home traveling expenses under section 162(a)(2). A second issue, which is present only in 1969, is whether petitioner is entitled to dependency exemption deductions for four children of Jo Ann Fuller Coleman by a prior marriage. FINDINGS OF FACT The return for each of the years involved was filed with the Internal Revenue Service Center *255 at Chamblee, Georgia. Petitioners John Coleman and Jo Ann Fuller Coleman, husband and wife, resided at Enterprise, Mississippi, at the time the petitions were filed. Petitioner was employed by Lockheed as a field team member during 1967, 1968, and for a portion of 1969, and by Dynalectron as a field team member during another portion of 1969. Each of those companies had a contract with the United States Air Force during the taxable years to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The *256 record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii) (e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government) -- $11.00-Per *257 day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given *258 year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field *259 team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there *260 until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field *261 team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. *262 Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner first began field team employment with Lockheed during early 1966, and was assigned to Key Field in Meridian. At some point in 1966 he left Lockheed's employment at Key Field and went to Lake, Charles, Louisiana, where he worked for Lockheed in non-field team employment and where he drew no per diem. After three months at Lake Charles he returned to Key Field. He remained *263 at Key Field until some time in 1967, when he was laid off. After about three weeks of lay-off, he was sent by Lockheed to Homestead Air Force Base near Miami, Florida, where he remained for approximately three months. Then, on or about November 17, 1967, petitioner was reassigned by Lockheed back to Key Field. He remained at Key Field until October or November 1968, when he was transferred for one month to an air base at Columbus, Mississippi, while the runways at Key Field were being repaired. After the runway repairs were completed, Lockheed transferred petitioner back to Key Field where he remained until August 1969, when Dynalectron supplanted Lockheed at Key Field. In mid-September 1969, petitioner went to Houston, Texas, where he was employed by Brown & Root, a construction company. While still in Houston, petitioner drove back to Meridian and made application for employment with Dynalectron at Key Field. He was promptly hired, returned to Houston to obtain his belongings, and came back to Meridian with his family and entered on duty with Dynalectron at Key Field on November 3, 1969, where his assignment continued throughout the remainder of 1969 and until January 8, 1971. *264 Petitioner's father was a member of the United States Navy until his retirement in 1965. For many years during his Navy service he had been stationed at Memphis, Tennessee, and it appears that petitioner may have been born in Memphis. His primary education was received in that city.In about 1960, petitioner's parents moved the family to Meridian. They did not sell the house they owned in Memphis, but instead rented it. Petitioner's father retired from the Navy, as mentioned, some time in 1965, and petitioner's father went to work for Lockheed at Key Field. Petitioner, after finishing high school and after some training with the Air National Guard, became employed with Lockheed, as mentioned, in early 1966. To both Lockheed and Dynalectron, petitioner gave an address in Memphis as his permanent residence.The address so furnished to Lockheed which was not ever changed by petitioner, was that of the house rented out by his parents and which they sold in July or August 1968. The address furnished to Dynalectron was that of the home of an aunt. Petitioner did not reside in Memphis at any time during the taxable years involved, but visited there several times during such period. *265 Petitioner was married to Charlotte Coleman in 1966 and that marriage was ended by divorce about 2 1/2 years later in 1968. During 1967, at least after petitioner's return to Key Field from Florida, petitioner and his wife and their infant child lived at an apartment in Meridian. On January 18, 1968, petitioner and Charlotte purchased a home near Key Field from a fellow Lockheed employee who was being transferred. Petitioner and Charlotte and the child lived in that house until their divorce, when the house was sold. Following the divorce petitioner was sent to Columbus for the above-mentioned one-month assignment. Upon his return to Meridian following the Columbus assignment, petitioner lived with his parents in their home at nearby Marion, Mississippi, for the remainder of the year 1968. In January 1969, petitioner took up residence in a house near Enterprise, Mississippi, about 15 miles from Meridian. That house was occupied as the home of Jo Ann Fuller (who later that year in September was married to petitioner), her four children, and her mother and step-father. That living arrangement continued until petitioner's marriage to Jo Ann, when he and she and the four children *266 moved to Houston, where petitioner became employed by Brown & Root. When he came back to Key Field with Dynalectron in November, he and Jo Ann and the children rented a house of their own at Enterprise where they lived for the remainder of the year. Petitioner received per diem payments from Lockheed of $352 in respect of his November and December 1967 assignment at Key Field; $3,104 in respect of his Key Field and Columbus, Mississippi, assignments in 1968; and $2,178 in respect of his Key Field assignment in 1969. He received per diem payments of $414 from Dynalectron in respect of his November and December 1969 Key Field assignment. Petitioner did not include any of such payments in gross income on the returns for the years received. Respondent determined that such payments were includible in gross income for the years received under section 61(a)(1).
As mentioned above, petitioner took up residence in early 1969 in the house occupied by his wife-to-be (Jo Ann), her four children, and her parents, Mr. and Mrs. Claude Pulley.That living arrangement continued until petitioner and Jo Ann were married in mid-September 1969. During that period petitioner regularly gave money *267 to Jo Ann which she used to buy food and necessaries for the entire group. The house in which the group lived was situated on land owned by an individual named Benny Herksh, who lived in Enterprise. He permitted Mr. Pulley and the group to occupy the premises rent-free in exchange for Mr. Pulley's watching over the premises (where Mr. Herksh kept cattle) to keep hunters from coming on the land. Mr. Pulley's cousin, Billy Robinson, gave him money from time to time. Neither the amounts so given to Mr. Pulley, nor the purposes for which he expended them are shown by the record. Other than the arrangement between Mr. Pulley and Mr. Herksh, Mr. Pulley had no employment and earned no income; nor did Mrs. Pulley. Neither of them received any welfare payments. Jo Ann earned approximately $83 take-home pay in 1969, prior to her marriage to petitioner. After petitioner and Jo Ann were married in mid-September, he was the sole support of her and the children. OPINION 1.Per Diem/Travel Expense Issue.--It must first be determined whether the per diem payments received by petitioner from Lockheed in 1967, 1968, and 1969, and those received from Dynalectron in 1969 are includible *268 in his gross income for those years. It is believed that they are. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention to tax "all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized, and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in petitioner's gross income for 1967, 1968, and 1969 the per diem payments he received in those years. Leo C. Cockrell, 38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4] It is to be noted that respondent has included in 1967 only those per diem payments received during petitioner's November and December assignment to Key Field, and did not include *269 the payments received in respect of his earlier 1967 Key Field assignment or his Florida assignment. The question remains whether petitioner is entitled to deduct under section 162(a)(2) amounts equal to all or any portion of the per diem payments received in each year, as expenses of travel while away from home in pursuit of his trade or business as an employee of Lockheed and Dynalectron, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer *270 should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Two points are thus presented: Were petitioner's assignments temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional *271 and duplicate living expenses? There were four assignments involved: (1) Key Field from mid-November 1967 to the time of the Columbus assignment in October or November 1968; (2) the one-month Columbus assignment; (3) Key Field from the conclusion of the Columbus assignment to August 1969; and (4) Key Field in November and December 1969. Respondent concedes that assignments (2) and (3) were temporary. However, he urges that (1) and (4) were indefinite. Bearing in mind the contractual arrangements between the employers and the Air Force and the employment arrangements between petitioner and his employers and his own employment history -- all as described in the Findings of Fact -- it is believed that assignments (1) and (4) should likewise be regarded as only temporary. The second point is whether petitioner maintained two places of abode during each of the four assignments and thereby incurred those duplicate living expenses the mitigation of which the deduction under section 162(a)(2) is designed to achieve.The evidence is persuasive that he clearly did not. So long as his first marriage to Charlotte lasted, he and she lived together in an apartment and later in a house which *272 they purchased, both at Meridian. When the marriage ended, petitioner went alone to Columbus. After Columbus, he was briefly at home near Meridian with his parents. Thereafter, he lived near Meridian with the family of his wife-to-be, and, finally, after he married Jo Ann with her and her children near Meridian. In each assignment of the four, petitioner was maintaining his only abode at the place of that assignment, and he incurred only one set of living expenses. Thus, the localities of those assignments were his tax home, and he was not away from home when he was at them. By no stretch of the imagination could Memphis, Tennessee, be regarded as his home for the purposes of section 162(a)(2). Accordingly, petitioner should not be allowed a deduction of any amount under that section for any of the years involved. 2. Dependency Exemption Issue.--Here it must be determined whether petitioner furnished more than half of the support in 1969 for each of the four children of Jo Ann by her former marriage. Clearly, during the period from and after the marriage in mid-September, petitioner furnished all of their support. And, though the proof is not so precise as might be desired, *273 nevertheless the total impact of the evidence is that petitioner was the chief means of their support for the previous portion of the year. Accordingly, he should be allowed a dependency exemption deduction for each of those children in 1969. * * * * *
In accordance with the foregoing, Decisions will be entered for the respondent in Docket Nos. 2925-71 and 3077-71. Decision will be entered under Rule 155 in Docket No. 3076-71. Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.